JOHN P. RADNAY, TRANSFEREE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; JOHN P. RADNAY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Radnay v. Commissioner
Docket Nos. 31633-81, 30518-84.
United States Tax Court
T.C. Memo 1989-237; 1989 Tax Ct. Memo LEXIS 237; 57 T.C.M. (CCH) 405; T.C.M. (RIA) 89237; May 15, 1989. *239 David M. Berman, for the petitioner. Susan Wynne, for the respondent. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: Respondent determined the following deficiencies and additions to tax against petitioner: Docket No. 31633-81
John P. Radnay, Transferee of Emersons, Ltd.
Additions to Tax [1]
Taxable Year Ending
Deficiency
Sec. 6653(b)
October 29, 1972
$ 118,140.00 $ 117,674.00
October 28, 1973
-0-   $ 266,515.00
October 26, 1975
(803.00)
28,217.00
Docket No. 30518-84
John P. Radnay, Individually
Additions to Tax
Year
Deficiency
Sec. 6653(b)
1972
$ 25,954.00
$ 12,977.00
1973
63,546.00
31,773.00
1974
78,699.00
39,349.00
1975
30,112.00
15,056.00
The issues presented for decision are as follows: (1) Whether petitioner John P. Radnay received unreported constructive dividends from Emersons, Ltd. during his taxable years 1972 through 1975; (2) Whether petitioner *240 is liable for additions to tax under section 6653(b) for his taxable years 1972 through 1975;
(3) Whether petitioner is liable as a transferee for the income tax deficiencies and additions to tax of Emersons, Ltd., as determined by respondent for its taxable years ended October 29, 1972, October 28, 1973, and October 26, 1975; and (4) Whether the statute of limitations bars the assessment and collection of any deficiencies in, or additions to, the income taxes of petitioner for his taxable year 1972. FINDINGS OF FACT Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference. When the petitions were filed in the instant consolidated cases, petitioner, John P. Radnay, resided in Florida. Emersons, Ltd. (Emersons) is a corporation that, during the times relevant hereto, had its corporate headquarters in Rockville, Maryland. It was originally incorporated in Delaware as Franchise Food Systems, Inc. On May 18, 1970, its name was changed to Emersons, Ltd. Subsequent references to Emersons herein will include references to that entity under its prior names. Emersons was engaged in the business of developing *241 and managing restaurants. Emersons grew from one restaurant in 1970 to 40 restaurants across nine states by 1975, and sales were over $ 30 million. Most restaurants were acquired during 1973, 1974, and 1975, during a "fast and hectic" expansion program. Emersons featured a steak and salad bar format, utilizing an "English pub" style. During the years in issue, Emersons established a number of discotheques, named "Dimples," in the bar areas of its restaurants. These "discos" operated only after regular dinner hours. They were meant to increase the profitability of Emersons, but instead apparently succeeded only in keeping away the family trade which had been the mainstay of Emersons' business. Petitioner is an attorney who, prior to founding Emersons, worked with a prominant law firm in Washington, D.C., and as an attorney with the U.S. Department of Justice. He received a masters degree in law from Georgetown University. With two other individuals named Ralph Emerson and Mark Rothman, petitioner founded Emersons. Between 1969 and 1976, petitioner was the president and chairman of the board of Emersons. He owned the largest single block of stock, some 13.6 percent of the *242 common at the end of the years at issue. Petitioner exercised virtually total control over Emersons during all times relevant. The evidence in this case shows that petitioner was a "dynamo" who devoted almost all his time and energy to making Emersons grow and prosper. A former close associate testified, "The company was his life, in every facet, in every way. So he conducted business wherever he was." A former vice president of Emersons stated, "When you say he ran the corporation, he was actually in all phases of it. * * * He was a very volatile man. * * * There are times he would go in a restaurant and get quite upset, throw things at the manager and make a scene in the restaurant. That was his makeup." Another associate at Emersons stated that petitioner's "social friends or acquaintances and his social life" were "somehow connected with Emersons." An associate who was not employed by Emersons explained that petitioner, "was a very intense individual who, I think, wanted a lot of power, and wanted to be successful." It is clear that petitioner's refusal to distinguish between his personal life and the business of Emersons worked to petitioner's considerable personal advantage. *243 His activities, while usually devoted to the advancement of Emersons, were often unscrupulous and driven by greed. He used the assets of Emersons to improve his house and to pay for much in the way of private travel and benefits. The corporation paid for his memberships in a number of tennis clubs and businessmen's clubs. Petitioner received kickback payments from breweries by virtue of his ability to name the brand of beer that Emersons would serve. He doctored Emersons' inventories to enhance the value of its stock (and the value of his holding of that stock). His unscrupulous activities ultimately led Emersons' board of directors to force petitioner to resign from his offices with the corporation. As a former lawyer for petitioner and for Emersons testified, "Mr. Radnay was the company. I think Mr. Radnay had an incredible amount of talent. And had he been an honest man, I think he could have made this into a multi-billion dollar entity." Respondent's examination of Emersons' income tax liabilities led to a disallowance of many claimed deductions, and many of the deductions disallowed related to petitioner. Respondent deemed those disallowed expenses to be taxable income *244 to petitioner in the form of constructive dividends. We have divided the asserted constructive dividends into general categories according to petitioner's taxable years. Respondent has made some concessions which are reflected in the following explanation. Home Improvements, Maid, and Furnishings
On November 1, 1971, petitioner purchased a home in Potomac, Maryland. He spent substantial amounts of his own funds in furnishings and improvements to the Potomac residence. In 1972, however, he embarked on a program of having Emersons pay for furnishings and improvements to the home. The bulk of these expenses were payments to contractors who either had done substantial work for Emersons, or who petitioner hired to work on his home. Petitioner consulted with his old friend Eli Levi, who served as the treasurer, vice president, and comptroller of Emersons, to fashion a scheme to have Emersons pay for improvements to the Potomac residence without having such payments show up as such on the books of Emersons. The two then devised a plan whereby bills and invoices for these improvements were altered to indicate that the renovations or purchases actually made for the Potomac *245 residence were instead made for various Emersons' restaurants. Petitioner set up a program whereby Emersons' construction department would charge the expenditures for the Potomac residence to individual restaurant units. He told Randolph Herman, who headed the construction department, that bills for work on the Potomac residence were to be "generic" in nature, vague about the location and nature of the work, but specific about time, materials, and labor. Additionally, bills for work performed at the Potomac residence were whited over and made to reflect that the work had instead been performed at one of Emersons' restaurants. Among the principal contractors who performed work on the Potomac residence was Carole Lindenburg, who did interior design and supplied furnishings for the Potomac residence, and who was instructed to send her bill to Emersons. Jack Grady Beebe painted the interior of the Potomac residence as well as performing other services for Emersons itself. Emersons paid Beebe $ 1,061.55 for work done at the residence. Edward Aaronson, of Woodmont Carpeting, supervised extensive carpeting work on the Potomac residence and in the apartments of petitioner's sister and *246 of his cousin Thomas Aknay. Aaronson was instructed to, and did, bill Emersons for the carpeting. A representative of Douglas Distributing Company testified that a small freezer, a refrigerator, a microwave oven, and an ice maker were delivered to the Potomac residence and paid for by Emersons. Frederic Brush selected the furniture for the basement entertainment area of the Potomac residence. Petitioner instructed Brush to indicate in his billing that the furniture was for a facility in West Orange, New Jersey. Brush did so, but referred in his billing to the "PERSONAL" interest petitioner took in the project as a way of indicating Brush's disapproval of the manner of billing. Neil Hodes was an employee of Emersons during the time at issue, in charge of repair and maintenance work for Emersons. He was also assigned to supervise the work going on at the Potomac residence. He was directed to approve invoices for work done at the Potomac residence even though those invoices erroneously reflected that the work was done at Emersons' restaurant sites. During the workday, he would supervise work on petitioner's swimming pool and cabana. Following instructions, he ordered the appliances *247 mentioned above from Douglas Distributing. He observed the work of other contractors, such as Jensen Landscaping, which did the landscaping and lighting, and D. M. Grant Co., which did work on the poolside. He recalled All Around Plumbing doing work at the residence, as well as Mona Electric. He further testified that the Union Hardware Company furnished materials that were used on the residence. Frank Fischetti was a renovation contractor who performed substantial work for Emersons. He also did renovation work on the basement of the Potomac residence. He was instructed to, and did, bill Emersons for the work performed on the Potomac residence. He was also told to have Emersons pay Rockville Electric for supplies used in that renovation. A concern named Ft. Myers Concrete performed work on the swimming pool deck at the Potomac residence. At petitioner's request, the bill reflected work done at a restaurant in Alexandria, Virginia.The bill, for $ 8,900, was paid by Emersons. In 1974, a firm named General Office Furniture delivered some outdoor furniture to the Potomac residence and was paid $ 1,451 by Emersons. In 1973, petitioner arranged for Emersons to pay the salary *248 of his maid, who worked only at petitioner's personal residence. The maid's duties included cleaning house, cooking, and taking care of petitioner's children. She occasionally helped out in preparing for and cleaning up after parties petitioner put on at his residence for Emersons' employees. For the years in issue Emersons made the following payments for the improvements, furnishings, and maid services at petitioner's residence: 1972
Date
Payee
Amount
1/11/72
Mendelson Galleries
$   418.00
2/22/72
Woodmont Carpet
1,991.49
4/11/72
Leonard Galleries
500.00
4/11/72
Cathedral Galleries
100.00
4/11/72
Sherbee Antiques
1,365.00
4/11/72
Browner Antiques
1,500.00
4/11/72
Paul Seigel Antiques
237.00
4/11/72
Neumart Antiques
1,030.00
4/11/72
I. Seigel
4,217.00
4/27/72
Villa Antiques
100.00
4/28/72
Four Seasons
1,105.00
7/25/72
Virginia Safe & Lock
119.60
10/18/72
Paul Kloman
113.00
10/31/72
Lindenburg Interiors
598.00
11/16/72
Paul Kloman
1,350.00
12/07/72
Woodmont Carpet
536.38
1972
J. R. Knudsen
149.29
1972
Woodmont Carpet
536.00
1972
All Around Sewer
1,500.00
1973
Date
Payee
Amount
2/21/73
Ogden Ecology Product
$    300.00
3/13/73
Niccolini
644.00
3/21/73
Artisan Lamp
1,000.00
6/19/73
Woodmont Carpet
232.90
July 73
Woodmont Carpet
1,253.90
7/05/73
Ft. Myers Concrete
8,900.00
9/27/73
Mona Electric
1,500.00
11/23/73
Woodmont Carpet
636.00
12/07/73
Fischetti Construction
3,800.00
12/10/73
Mona Electric
411.04
12/31/73
J. Stafilatos
430.00
1973
Union Hardware
16.20
1973
All Around Sewer
29,000.00
1973
Delia Acosta (Maid)
1,853.00
1973
All Around
6,000.00
1973
C & P 301-289-3157
194.83
*249 1974
Date
Payee
Amount
1/04/74
Bernice Steiner
$  9,000.00
1/08/74
Western Fence Company
307.58
1/29/74
W. M. Burton
806.00
2/01/74
Fischetti Construction
6,775.00
2/4/74
Petty Cash (house paint)
51.70
2/27/74
United Glass and Mirror
1,000.00
3/08/74
Douglas Stereo
1,215.84
3/11/74
United Glass and Mirror
668.46
3/12/74
Jensen Landscaping
7,300.00
3/29/74
Douglas Distributing
362.70
4/16/74
Douglas Distributing
442.00
4/25/74
Douglas Distributing
240.42
5/22/74
Lindenburg Interiors
400.00
6/05/74
United Glass and Mirror
2,300.00
6/10/74
Lindenburg Interiors
1,000.00
9/04/74
D. M. Grant
5,453.00
9/24/74
Donald Cahill
255.00
9/27/74
D & M Woodworking
1,451.00
10/07/74
Lindenburg Interiors
1,000.00
1974
Rockville Electric
2,143.64
1974
Union Hardware
898.46
1974
General Office Wholesale
1,415.85
1974
All Around
11,000.00
1974
All Around Sewer
6,000.00
1974
Delia Acosta (Maid)
4,507.00
1975
2/07/75
Frederick Brush
$ 6,264.00
2/07/75
Douglas Stereo
1,216.00
3/20/75
Make-A-Frame
111.00
4/10/75
Douglas Distributing
442.00
5/01/75
Make-A-Frame
136.00
5/04/75
Mirror
30.00
5/07/75
Custom Sound
135.00
5/15/75
All Around
131.80
5/14/75
George's 364.00
8/12/75
All Around
123.20
9/20/75
Make-A-Frame
110.00
1975
Frank Hardware
248.00
*250 All of the foregoing amounts, paid by Emersons for petitioner's home improvements, furnishings, and maid service, were paid for petitioner's personal benefit, and not for Emersons' business purposes. For each year at issue, their totals are as follows: 1972
$ 17,465.76
1973
56,171.87
1974
65,993.65
1975
9,311.00
Travel and Entertainment Expenses
Petitioner travelled constantly in his capacity as president and chairman of the board of Emersons. During the time he held those offices, the number of Emersons' restaurants grew from one site to 40, located in nine states. Petitioner spent much of his time analyzing new sites, attending the openings at those sites which were selected, and visiting already-established facilities. Moreover, Emersons planned a substantial public offering of its stock for 1976. At the request of the underwriters, petitioner presented "dog and pony" shows to potential investors, in the United States and in England, explaining the presumed advantages of investing in Emersons' stock. Petitioner also took a substantial interest in advertising for the chain and travelled to California to supervise the making of commercials for *251 Emersons. Petitioner used company-issued credit cards to pay for his travel. He also would cash Emersons' checks at the hotels where he was staying. Sometimes his travel expenses were paid from his own funds and reimbursed by payments from the company. Petitioner routinely submitted voucher forms to the accounting department of Emersons. Thereon he would write the amounts paid for travel, meals, lodging, and entertainment. He would often scrawl upon the vouchers the names of persons he had entertained, and, occasionally, the purpose of the travel. Often, but not always, he included receipts with the vouchers. It appears that petitioner was routinely reimbursed for his expenses, or that his charges were paid promptly by the company. The vouchers failed to indicate just what expenses related to what meetings, however, and there is no indication that all of the entertainment or lodging was was directly related to the business of Emersons. Moreover, petitioner at times took his wife or family members with him on reimbursed travel, but there is no proof that the presence of his wife or family was ever required as part of the business of Emersons that petitioner conducted while travelling.
*252 From the records before us it appears that petitioner's figures, even if unsubstantiated by receipts or otherwise, were nevertheless sufficient to permit Emersons' payment of petitioner's bills, either in the form of payments of credit card charges, or advances to him, or reimbursements paid directly to petitioner. In sum, Emersons' internal audit procedures may have tracked the amounts of money spent, but those procedures did not establish that all the money was spent on Emersons' business. Petitioner, in fact, conceded that he used Emersons as a personal "deep pocket" and that his recordkeeping never grew to the level of sophistication required for a publicly-traded corporation. The major portion of petitioner's time while travelling and entertaining was, however, spent in furthering the expansion and profitability of the Emersons' chain. Accordingly, the bulk of the amounts spent by Emersons in reimbursing petitioner for his travel and entertainment expenditures, or in paying his corporate travel charge card accounts, was spent as legitimate business expenses of Emersons. Respondent nevertheless disallowed all of Emersons' deductions for travel and entertainment expenses *253 that related to petitioner's travel. Respondent further determined that the travel and entertainment expenditures incurred by petitioner constituted constructive dividends taxable to him. The amounts and dates are as follows: 1972
Date
Payee
Amount
1/10/72
Summit House
$    100.00
1/11/72
Summit House
200.00
2/15/72
Regency Hotel
100.00
4/10/72
Cash
50.00
4/11/72
Cash
250.00
4/27/72
Waldorf Astoria
50.00
5/01/72
Regency Hotel
200.00
5/02/72
Cash
20.00
5/16/72
Delmonico Hotel
200.00
6/06/72
Cash
200.00
6/14/72
Plaza Hotel
100.00
6/14/72
Plaza Hotel
200.00
6/15/72
Plaza Hotel
100.00
7/27/72
World Wide Travel
769.00
11/15/72
World Wide Travel
338.00
1972
Regency Hotel
200.00
1972
Host Carrol
465.32
1972
American Express
10,995.00
1972
Master Charge
980.00
1973
1/17/73
Regency Hotel
$    150.00
5/01/73
Cash
300.00
9/04/73
Cash
200.00
10/30/73
Religious Tours
2,238.00
10/31/73
Olla Podriva Restaurant
300.00
11/12/73
Frommer Travel
2,000.00
11/12/73
Aquinas Ltd. (London)
28.75
11/17/73
Essex House
100.00
11/26/73
Cash
500.00
11/27/73
Cash
1,000.00
11/29/73
Rockville Travel
1,319.72
12/11/73
John P. Radnay
800.00
12/13/73
Lawrence Frommer
1,399.43
1973
Regency Hotel
200.00
1973
American Express
10,221.00
1973
Master Charge
1,894.00
1974
1/15/74
Manor Vail Lodge
$    92.00
2/21/74
John P. Radnay
146.00
3/20/74
American Airlines
41.64
3/27/74
Holiday Jet Service
2,060.16
4/01/74
Cash
500.00
5/07/74
Essex House
200.00
5/08/74
World Wide Travel
344.00
5/22/74
Essex House
150.00
5/23/74
Cash
200.00
7/17/74
Cash (Regency)
200.00
9/13/74
Cash
500.00
10/10/74
Essex House
200.00
10/11/74
Essex House
500.00
10/11/74
Essex House
150.00
11/12/74
Essex House
220.00
11/12/74
Check Cashed
175.00
12/12/74
No invoice
400.00
12/16/74
No invoice
300.00
12/20/74
No invoice
400.00
1974
American Express
9,930.00
1974
Diners Club
3,393.00
1974
Master Charge
2,301.00
1975
5/07/75
Palm Bay Club
$    300.00
5/15/75
Delta Airlines
301.48
1975
Club Caballero
1,219.00
1975
Travel & Entertainment
30,072.00
*254 For each of the years at issue, Emersons paid the following amounts of travel and entertainment expenses which were used by petitioner for his personal benefit, and not for Emersons' business purposes: 1972
$  5,312.76
1973
6,326.67
1974
7,840.82
1975
11,162.37
Beer Kickbacks
Starting in 1970, petitioner alone handled the purchase of beer to be sold in Emersons' restaurants. In 1970, petitioner bought Ballentine beer (later Falstaff beer) for Emersons. One Robert Weir, who worked for Ballentine, paid petitioner $ 2 per keg to keep petitioner buying Ballentine beer for Emersons. In 1971, petitioner told Weir that the Schlitz beer company would pay petitioner $ 4 per keg to buy its beer. When Weir refused to match this deal, petitioner switched to Schlitz for Emersons' restaurants. Petitioner then dealt with a Moe Bisker, who represented Schlitz beer in the area generally served by Emersons. Bisker, in complicity with an official of Schlitz, acceded to petitioner's demands for cash kickbacks for the purchase of their beer. Accordingly, an arrangement was made whereby Schlitz paid $ 2 per keg and American Sales (the distributorship headed by Bisker) *255 paid another $ 2 per keg so that Emersons would buy Schlitz beer. Some of the proceeds went to Warren Adler Company, which performed advertising services for Emersons. Some part of the proceeds, however, were paid by Bisker or his employees in cash directly to petitioner. Petitioner's records show frequent meetings during 1972, 1973, and 1974, with representatives of American Sales. In 1973, however, petitioner again switched some business to Falstaff. An individual named Terry Boyle took over the payments of kickbacks to petitioner; this time petitioner got $ 3 per keg personally in kickbacks resulting from Emersons' purchase of beer. The money came from Falstaff through three other businesses in the Washington area that cashed the checks before the cash was paid to petitioner. During 1973 and 1974, some $ 10,980 cash was delivered to petitioner. Petitioner did not tell the board of Emersons that he was receiving kickbacks from the beer companies, and he did not report the receipt of these kickbacks on his personal Federal income tax returns. The Bureau of Alcohol, Tobacco, and Firearms (BATF) became aware of these kickbacks. Petitioner learned that he was about to be questioned *256 about the kickbacks, and consulted with Levi about Emersons' finances. Petitioner and Levi formed a plan to show that the kickbacks were all received by, or on behalf of, Emersons and kept in Emersons' accounts or spent on its business purposes. Petitioner, with Levi's assistance, turned over some $ 5,900 in beer kickbacks to Emersons, but he could not come up with the amount needed to pay over the balance of the kickbacks he thought that he had been reported to have received from Falstaff. (Petitioner has consistently denied receiving cash as a result of selling Schlitz products.) Levi found some $ 1,780 in Emersons' accounts which had come from the auction of surplus furniture and restaurant equipment. For the balance, however, Levi arranged with some middle-management Emersons' employees to prepare affidavits indicating that the money had been received on behalf of Emersons and had been used in restaurant opening celebrations -- that is, that the kickbacks had been used by Emersons for business purposes, and not by petitioner personally. Although the affidavits were incorrect, petitioner did spend some amounts of the beer kickbacks directly for Emersons' benefit by using the *257 cash for promotional activities and the like. The plan came apart when an Emersons' lawyer learned the affidavits had been fabricated. Emersons' board of directors was informed of petitioner's receipt of the kickbacks. The board also learned that, for Emersons' fiscal year 1975, petitioner and Levi had mislabelled meat in Emersons' inventory to overstate the inventory by $ 400,000, resulting in an overstatement of Emersons' profits. This overstatement of profits, however, also had the effect of raising the amount of Federal income taxes which would have been owing from Emersons. For the years at issue the following amounts were paid by breweries, or their instrumentalities, to petitioner, and were not expended by him in furtherance of the business of Emersons: 1972
$  9,189.60
1973
13,774.20
1974
5,999.00
Petty Cash Withdrawals
Petitioner frequently used the Emersons' outlets as his personal source of funds. When he needed cash, he would commonly stop into an Emersons' restaurant and sign a voucher for $ 100 or more, taking the cash from that restaurant's petty cash fund. Emersons would later reimburse the restaurant for the amount reflected on *258 the voucher. When some of the restaurant managers complained, a vice president of Emersons told them that they could, if they wished to, take the risk of criticizing the president and chairman of the board for his practices. There is no indication that any of the managers did so. Petitioner made the following petty cash withdrawals in the years indicated: 1972
Date
Payee
Amount
1/25/72
Petty Cash
150.00
2/14/72
Petty Cash
100.00
2/24/72
Petty Cash
150.00
4/15/72
Petty Cash
250.00
5/22/72
Petty Cash
200.00
6/08/72
Petty Cash
100.00
7/11/72
Petty Cash
15.40
7/13/72
Petty Cash
100.00
7/22/72
Petty Cash
250.00
9/10/72
Petty Cash
100.00
10/13/72
Petty Cash
150.00
10/22/72
Petty Cash
2,100.00
1972
Petty Cash
250.00
1972
Petty Cash
100.00
1972
Petty Cash
25.45
1973
3/19/73
Petty Cash
400.00
4/30/73
Petty Cash
500.00
5/04/73
Petty Cash
500.00
5/17/73
Petty Cash
25.00
12/31/73
Petty Cash
430.00
1974
2/16/74
Petty Cash
500.00
2/25/74
Petty Cash
500.00
12/29/74
Petty Cash
200.00
1975
1/17/75
Petty Cash
1,000.00
2/03/75
Petty Cash
300.00
4/09/75
Petty Cash
600.00
7/20/75
Petty Cash
300.00
9/12/75
Petty Cash
425.00
10/24/75
Petty Cash
500.00
1975
Petty Cash
150.00
1975
Petty Cash
250.00
*259 Of the foregoing petty cash withdrawals, petitioner received the following amounts, for each of the years at issue, for his personal use and benefit, and not in furtherance of the business interests of Emersons: 1972
$ 3,232.68
1973
1,484.00
1974
960.00
1975
2,820.00
Miscellaneous Expenditures
Respondent's examination of Emersons' books and records revealed a number of other payments by Emersons, including claims for automobile depreciation, which were not, at least to respondent's satisfaction, shown to constitute legitimate business expenses of Emersons. (Emersons had paid for a Jaguar and a Mercedes-Benz sports car for petitioner's use. He and his wife used these automobiles extensively.) Petitioner had taken an active role in every phase of the business and reserved to himself the authority to write Emersons' checks in amounts greater than $ 500. Respondent accordingly attributed many of these otherwise unexplained expenditures to petitioner in the form of constructive dividends. These miscellaneous expenses, which have been deemed taxable income to petitioner, are as follows: 1972
Date
Payee
Amount
1/11/72
Mariane Beuck
$   300.00
2/15/72
Melinda Reed
200.00
5/09/72
Helga Gudnundstottier
200.00
6/07/72
Denise White
500.00
6/15/72
Corn & Son
200.00
6/16/72
Denise White
200.00
8/15/72
Garfinkels
120.00
8/16/72
Yeshiva Farm
6,000.00
8/18/72
Caliban Realty Corp.
552.50
9/22/72
Maria Talley
1,100.00
9/29/72
Cash
450.00
11/14/72
Garnett Haas
200.00
11/28/72
Bobower Yeshiva
6,000.00
12/03/72
Cash
250.00
12/21/72
W. Bell Co.
1,103.56
1972
Auto Depreciation
2,195.00
1973
1/06/73
Trudey Lenten
$   150.00
1/08/73
Bachrach
19.92
1/24/73
D.C. Bar
25.00
2/02/73
Sisterhood Har Shalom
27.00
2/09/73
Caliban Realty
800.00
2/22/73
Cash
100.00
2/22/73
James Orem
135.00
3/13/73
Nouveau Art
325.00
3/16/73
Bachrach
48.84
3/16/73
Bachrach
279.51
3/19/73
20th Century Limo
100.00
4/09/73
Geico
13.49
5/04/73
Garnett Haas
500.00
5/07/73
Bachrach
40.56
6/08/73
Hutzler's Department Store
100.00
6/13/73
Admiral's Club
250.00
6/20/73
Elizabeth Ray
320.00
7/21/73
Congressman Gray
150.00
8/21/73
West Port Art Gallery
408.00
9/05/73
D.C. Bar
50.00
9/17/73
Potomac Supermarket
49.16
10/03/73
Jewish Community Center
150.00
10/12/73
Jewish Community Center
160.00
11/06/73
D.C. Bar
24.00
11/13/73
Models Guild
225.00
11/26/73
Irene Williams
60.00
11/30/73
Delores Brown
500.00
11/73
Friedlander, Friedlander
& Brooks
1,491.00
12/03/73
Cash
250.00
12/04/73
D.C. Bar
24.00
1973
G. Williams Van Service
400.00
1973
Banford
31.20
1973
Susan Edwards
200.00
1973
Miller & Gartner
700.00
1973
Auto Depreciation
2,925.00
1974
1/02/74
Clerk, D.C. Court
$    20.00
2/17/74
N.Y. Plaza Club
235.00
2/20/74
N.Y. Plaza Club
334.80
2/21/74
Tom Woods
331.41
2/22/74
ITU 4957
117.00
3/29/74
Grady & Dean
1,061.88
3/29/74
Marianne Radnay
41.64
4/01/74
Alex Fleming Interiors
300.00
4/21/74
Delores Brown
500.00
5/05/74
Liquor (Petty Cash)
89.00
5/06/74
D.C. Court
30.00
5/08/74
AAA
22.00
5/08/74
Hellers Camera Shop
130.52
5/09/74
Auto Enthusiasts
195.00
5/09/74
Chamberlain & Royal
100.00
6/06/74
European Kosher Products
40.16
6/12/74
European Kosher Products
41.51
7/1974
Bolden Tile Co.
165.00
8/02/74
Susan Bolden
200.00
8/05/74
Edward A. Aaronson
5,000.00
9/06/74
Flyer Distribution
666.00
9/18/74
D.C. Bar
50.00
9/19/74
Redskin Tickets
350.00
9/25/74
Delores Brown
500.00
10/02/74
Jewish Community Center
325.00
10/08/74
Jewish Community Center
100.00
10/14/74
Sisterhood Har Shalom
35.00
10/23/74
Maggie Kay
250.00
10/23/74
Indian Springs Racquet Club
1,217.00
10/23/74
King Corcoran
300.00
10/28/74
D.C. Bar
245.00
11/04/74
Maggie Kay
400.00
11/15/74
Mickey Weissman
500.00
12/02/74
Apartment Construction News
6.00
12/12/74
World Mark
150.00
12/17/74
L. Sugar
2,000.00
1974
Alex Fleming Interiors
250.00
1974
Miller & Gartner
877.00
1974
C&P Telephone (301) 289-6044
108.79
1974
Auto Depreciation
6,283.00
1975
3/07/75
Heeney,McAuliffe & Rowan
$   250.00
3/18/75
Linda Griffin
200.00
3/18/75
Georgetown Prep Tennis Club
135.00
3/23/75
Ritz Carlton
113.36
3/28/75
Browning & Baines
33.00
4/10/75
All Seasons Racquet Club
35.00
4/28/75
American Hungarian Foundation
100.00
5/14/75
All Seasons Racquet Club
1,023.00
5/15/75
R. Tyson & Co.
125.00
5/16/75
Ann Barry
200.00
6/16/75
D.C. Bar
34.00
6/18/75
Terry Miller
30.00
7/03/75
Ann Barry
100.00
8/18/75
Ziemer Joras Ltd.
828.00
9/02/75
Variety
30.00
9/08/75
J. Badger
2,000.00
9/15/75
Four Seasons
100.00
11/05/75
All Seasons Racquet Club
1,032.00
11/07/75
Hyla Marrow
500.00
11/11/75
Duke Zeiberts
174.00
12/04/75
Tiffany Livery Ltd.
392.30
1975
European Kosher Products
257.00
1975
Dalton Auto Body
264.71
1975
John P. Radnay - Disbursed
2,930.00
1975
Auto Depreciation
7,340.00
*260 Of the foregoing miscellaneous expenditures, Emersons paid the following amounts, in the years indicated, for the personal benefit of petitioner and not in furtherance of its business interests: 1972
$  6,719.06
1973
7,381.17
1974
18,447.71
1975
17,426.37
In 1972, petitioner and Eli Levi borrowed substantial sums from Emersons to purchase stock in a competing concern named Longchamps. Petitioner testified that corporate counsel later advised him that Emersons could not invest in a competitor, and that doing so was a violation of the corporate charter and would require disclosure to the Securities and Exchange Commission. (Emersons' counsel does not recall these events.) Accordingly, petitioner and Levi took the Longchamps' stock in their own names. They incurred substantial losses when the Longchamps' stock declined in value, but they nevertheless repaid the corporation the full amounts borrowed. In 1975, before the contemplated public offering of Emersons' stock, Emersons' board requested petitioner and other officers of Emersons to surrender a number of options they held to purchase Emersons' stock on favorable terms. It was believed that the existence *261 of outstanding options would adversely affect the success of the public offering. Petitioner and other officers surrendered their options as requested, receiving nothing specifically in return. Upon surrendering his options, however, petitioner did receive an increase in salary to $ 95,000 per year. Emersons' corporate income tax returns for the years in issue were filed with the Internal Revenue Service Center in Philadelphia, Pennsylvania. Petitioner filed his joint Federal income tax returns with the Internal Revenue Service Center in Philadelphia, Pennsylvania. For the years in issue, he reported wages from Emersons and dividend income as follows: Year
Wages
Dividends
1972
$ 36,796.00
$ 158.00
1973
$ 38,323.00
- 0 -
1974 $ 48,577.00
- 0 -
1975
$ 74,646.00
- 0 -
These wages were relatively low for an officer who headed a company the size of Emersons. Emersons' board of directors expected him to ask for a larger salary, but he did not do so. The amounts reported on his tax returns, however, failed to indicate the value of improvements to his residence or the beer kickbacks or other items listed above and deemed by respondent to be constructive *262 dividends. Pursuant to Delaware law, Emersons had adopted very broad indemnification provisions whereby officers of the corporation could use corporate funds to provide for their legal defense with respect to "any allegations or charges related to activities performed while an officer of the company." In 1976, because the investigations of petitioner by the Securities and Exchange Commission and the BATF were coming to the fore, petitioner wrote checks on Emersons' accounts totalling $ 60,000 to hire attorneys. In May 1976, the Securities and Exchange Commission filed a Complaint for Injunction and Other Relief against Emersons, Ltd., John P. Radnay, and Eli Levy, in the United States District Court for the District of Columbia. Emersons entered into a consent judgment, pursuant to which it and its officers and directors agreed, inter alia, not to violate the Federal securities laws. The judgment referred to an attached "Consent" pursuant to which Emersons, "without admitting or denying" any of the allegations of the complaint, agreed to entry of the judgment. On February 10, 1977, Emersons filed a petition in bankruptcy under Chapter XI of the Bankruptcy Act, and operated *263 thereafter as a "debtor in possession." Respondent's revenue agent who had been examining Emersons' tax liabilities made his findings known to his superiors in the spring of 1977, but his recommendations were not officially forwarded until October of 1977. On July 15, 1977, Emersons filed a Form 1139, "Corporation Application for Tentative Refund From Carryback of Net Operating Loss" wherein it sought a refund of taxes paid for its 1973, 1974, and 1975 taxable years. Pursuant to this request, the Internal Revenue Service refunded to Emersons taxes in the amount of $ 150,173.28 for its 1973 taxable year and $ 338,669.48 for its 1974 taxable year. On February 23, 1978, an information was filed against petitioner charging him with violations of 15 U.S.C. sections 78m(a) and 78ff (1982); 17 C.F.R. 240.13a-1; 18 U.S.C. section 2 (1982); and section 7206(1), I.R.C. 1954, relating to falsely subscribing a document under penalties of perjury. The information alleges, inter alia, that petitioner knowingly failed to report gross receipts of more than $ 10,000 on either his original or amended individual income tax returns *264 for 1974. On March 3, 1978, petitioner pleaded guilty to one count of violation of 26 U.S.C. section 7206(1) for the year 1974 and to one count of violation of 15 U.S.C. sections 78m(a) and 78ff. In 1979, petitioner and Emersons entered into a proposed settlement which, if effective, would require petitioner to repay $ 20,000 to Emersons for those improvements made to petitioner's personal residence and paid for by Emersons. Respondent issued a statutory notice of deficiency against Emersons on April 13, 1979, for the amounts set forth at the beginning of this opinion. Consents extending the time for assessment and collection of Emersons' income taxes had been signed for the years ending October 29, 1972, October 28, 1973, and October 29, 1974, so that the deficiency notice issued herein was timely for all the years in issue. On May 3, 1979, respondent filed a Proof of Claim in the United States District Court for the District of Maryland in the bankruptcy proceeding of Emersons regarding the company's income tax deficiencies. On October 5, 1981, respondent issued a notice of liability to petitioner as transferee, upon which docket *265 No. 31633-81 is based. Petitioner's representative had executed consents extending the time within which petitioner might be assessed as a transferee of Emersons, so that the Notice of Liability issued to petitioner as transferee on October 5, 1981, was timely. The notice alleged that funds and assets in the total amount of $ 493,031 were transferred for the personal use and benefit of petitioner and that these amounts were subject to collection in the payments of Emersons' tax liabilities. On May 31, 1984, respondent issued a statutory notice of deficiency to John P. Radnay and Marion E. Radnay (Hendler) upon which the above-entitled case at docket No. 30518-84 is based. Petitioner had executed consents so that the notice of deficiency was timely for his taxable years 1973, 1974, and 1975. Unless this Court finds that petitioner fraudulently underreported his income for 1972, however, the assessment and collection of any tax deficiency found to be owing by petitioner for that year is barred by the statute of limitations. OPINION Constructive Dividends
Respondent asserts that petitioner received unreported constructive dividends in the years 1972 through 1975 when he *266 caused Emersons, Ltd. to pay for many of his personal expenses, including expenses for improvements to his personal residence. Sections 301(a) and 301(c)(1) of the code require the inclusion in a taxpayer's gross income of amounts received as dividends. [2] Section 316(a) defines a dividend as "any distribution of property made by a corporation to its shareholders -- (1) out of its earnings and profits accumulated after February 28, 1913, or (2) out of its earnings and profits of the taxable year * * *." In accord with this broad definition, dividends may be either formally declared or they may be "disguised" or "constructive;" that is, the fact that a corporation has not formally declared a dividend, or even intended to confer a dividend, does not foreclose the finding that it has, in fact, distributed a dividend that is taxable to its shareholder. Ireland v. United States,621 F.2d 731 (5th Cir. 1980); Loftin and Woodward, Inc. v. United States,577 F.2d 1206, 1214 (5th Cir. 1978); Crosby v. United States,496 F.2d 1384, 1388 (5th Cir. 1974). *267 A shareholder can be charged with constructive dividend income even though neither the corporation nor the shareholder intended a dividend, and even though there has not been a pro rata distribution to each member of a given class of shareholders. Crosby v. United States, supra.
Accordingly, any expenditure by the corporation for the personal benefit of a shareholder may result in the shareholder's being taxed upon the receipt of a constructive dividend. In Crosby the Fifth Circuit held that a corporation's payment for improvements to the controlling shareholders' residence and payments of the shareholders' utility bills and gardening costs constituted a constructive dividend to those shareholders. In Lash v. Commissioner,245 F.2d 20 (1st Cir. 1957), the Court of Appeals affirmed this Court's Memorandum Opinion that the majority shareholder of a corporation was liable for taxes payable on constructive dividends resulting from his corporation's payment of a large number of his personal expenses, including telephone and automobile expenses, hotel bills, country club dues, and the cost of flowers. In Noble v. Commissioner,368 F.2d 439, 442 (9th Cir. 1966), *268 the Ninth Circuit affirmed another Memorandum Opinion of this Court according constructive dividend treatment to a corporation's payments, made on behalf of the controlling shareholders, for painting and repairs of their family residence, travelling expenses, summer residence expenses, and other items "of a personal nature." And in Greenspon v. Commissioner,23 T.C. 138, 151-152 (1954), affd. in part and revd. in part 229 F.2d 947, 953 (8th Cir. 1956), this Court imposed constructive dividend treatment upon a shareholder when his pipe manufacturing corporation paid for the construction of a "unique horticultural show place," even though the shareholder invited potential pipe customers to visit this farm. In determining whether a constructive dividend has been made, "The crucial concept * * * is that the corporation conferred an economic benefit on the stockholder without expectation of repayment." Crosby v. United States, supra, citing United States v. Smith,418 F.2d 589, 593 (5th Cir. 1969). Nevertheless, "Not every corporate expenditure incidentally conferring economic benefit on a shareholder is a constructive dividend. *269 " Crosby v. United States, supra at 1388. Instead, "In order for a company-provided benefit to be treated as income, the item must primarily benefit taxpayer's personal interests as opposed to the business interests of the corporation." Ireland v. United States, supra at 735. Thus, the fact that corporate funds pass through the shareholder's hands is not determinative; Palo Alto Town & Country Village, Inc. v. Commissioner,565 F.2d 1388, 1391 (9th Cir. 1977); and the fact that some amounts have been disallowed as corporate deductions does not mean that they are automatically constructive dividends to the shareholder. Ashby v. Commissioner,50 T.C. 409, 417 (1968). In the Eleventh Circuit, to which this case would be appealed, the burden is upon petitioner to prove that he is not, in fact, chargeable with unreported income. Gatlin v. Commissioner,754 F.2d 921 (11th Cir. 1985), affg. a Memorandum Opinion of this Court. We have described that burden as follows ( Gordon v. Commissioner,63 T.C. 51, 73 (1974), affd. in part and revd. in part and revd. in part 572 F.2d 193 (9th Cir. 1977), *270 cert. denied 435 U.S. 924 (1978)): Where petitioner proves respondent's determination to be arbitrary (i.e., without rational foundation in fact and based upon unsupported assumptions) and excessive, petitioner has no burden of proving the correct amount of tax which he may owe. This Court must then determine from the facts in the record, without regard to the presumption of correctness generally attaching to respondent's determination, the correct tax liability of the petitioner. * * * That burden, in general, is not onerous. This Court has accepted the proposition that "The law imposes much less of a burden upon a taxpayer who is called upon to prove a negative -- for example, that he did not receive the income which the Commissioner claims -- than it imposes on a taxpayer who is attempting to sustain a deduction on his return." (Citations omitted.) Llorente v. Commissioner,74 T.C. 260, 266 n.5 (1980), revd. in part on other grounds 649 F.2d 152 (2d Cir. 1981); see also Weir v. Commissioner,283 F.2d 675 (6th Cir. 1960), revg. a Memorandum Opinion of this Court; Schildhaus v. Commissioner,442 F.2d 1343 (2d Cir. 1971), *271 affg. a Memorandum Opinion of this Court; Clapp v. Commissioner,321 F.2d 12 (9th Cir. 1963), affg. 36 T.C. 905 (1961); 14 J. Mertens, Law of Federal Income Taxation, sec. 50.99, p. 304 (1987). Moreover, in cases of unreported income, it may be appropriate for this Court to make estimates of the amounts of such income, applying the principles analogous to those set forth in Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). Accordingly, when we are convinced that some part of asserted income was not, in fact, chargeable to a given taxpayer, we may estimate the amount of that income even in the absence of precise records and testimony, bearing heavily upon the taxpayer who is responsible for the uncertainty. Henry Schwartz Corp. v. Commissioner,60 T.C. 728, 744 (1973); see Llorente v. Commissioner,74 T.C. at 268. In this case, the uncontroverted testimony shows that petitioner devoted most of his waking time to the operation and expansion of the Emersons, Ltd. restaurant chain. Like the taxpayer in Dowell v. United States,522 F.2d 708 (5th Cir. 1975), cert. denied 426 U.S. 920 (1976), *272 petitioner was the type of driven "dynamo" who devoted almost all his energies to his job. Yet, unlike the case of the taxpayer in Dowell, here we cannot find that all the claimed corporate expenditures were ordinary and necessary expenses of the corporation involved. To the contrary, here Emersons provided petitioner with a household maid, with improvements to his basement and swimming pool at his personal residence, with free travel and entertainment, with memberships in tennis facilities and entertainment clubs, with new Jaguar and Mercedes-Benz automobiles, and with a "petty cash" system which provided him with a ready access to money for his routine spending purposes. These benefits were provided to petitioner for his own benefit, and not that of the corporation. Accordingly, on the facts of this case, we must determine as well as we can, the amounts of unreported income petitioner received from his corporation. Potomac Residence Expenditures
We accept respondent's attribution of the amounts that Emersons paid to improve petitioner's residence, and to pay for his domestic help, as income to petitioner. We are not persuaded by petitioner's arguments that the expenditures *273 were not for his personal benefit, but rather were the business expenses of the corporation. His burden of proof is not "met by showing that, periodically, business associates, or potential customers, were entertained * * *. This is nothing more than the usual practice in the business community * * *." Greenspon v. Commissioner, supra at 150. Accordingly, where a corporation makes "expenditures on the private home of its dominant stockholder and chief executive officer * * * the proof should be very clear and very certain that the expenses charged to the corporation were legitimate business expenses of the corporation. Otherwise, the opportunity of abuse would be great." Greenspon v. Commissioner,23 T.C. at 150-151. The record here shows no more than "incidental" entertaining took place at the Potomac residence. Accordingly, as in Greenspon we find that the corporate payments were meant to benefit petitioner, and not Emersons. And we do not have any basis for apportioning the expenses so that some part is not attributable to petitioner. As we said in Denny v. Commissioner,33 B.T.A. 738, 745 (1935): "Having due regard *274 for the norm of conduct of the average home, we should have very clear evidence on the point before we say that any particular percentage of its activities are purely commercial. We do not have that evidence here." We regard as frivolous the contention that the Emersons' payment for a convertible sofa and the design of a "masculine" den in petitioner's home were necessary for Emersons, notwithstanding the fact that associates of petitioner, such as Bud Mayo and Eddie Friedman, slept on the sofa rather than at a hotel during their visits. The corporation could have put up its associates or clients at a hotel, probably at less cost than furnishing taxpayer's residence. We are similarly inclined to accept the appraisal of Frederick Brush, who was hired to furnish petitioner's basement, about that basement. He was instructed to furnish it like a "Dimples" discotheque. He called the refurbished room an "ego trip room," and explained, "When you have business you don't cover yourself with mirrors." The basement was an affectation of petitioner's and not a legitimate business expense of Emersons. The asserted constructive dividends include a number of gallery purchases made early *275 in 1972, presumably for art objects and antiques. Petitioner has claimed that these were made for restaurants, but, without more, we cannot accept this argument. The gallery purchases were made within a few months after petitioner's purchase of his home. The testimony of former associates indicates that Emersons was furnished with "fake antiques" in the style of an English pub. It seems to us consistent with petitioner's practices to use Emersons' funds to purchase genuine antiques and art objects for his personal residence. He has not convinced us otherwise. We are, however, concerned about the size of some of the expenditures that respondent has attributed to petitioner as income -- specifically the allocation of $ 29,000 resulting from Emersons' payments to All Around Sewer in 1973 and another $ 17,000 paid to All Around Sewer in 1974. The record, however, does not permit us to find that the allocations were arbitrary, without foundation, and excessive. If the amount of these allocations disturbs us, it should have disturbed petitioner, too, and if he had convincing evidence to put forth showing that the allocations were wrong, we expect he would have done so. He did not, *276 and we have no choice but to accept the amounts asserted by respondent as income. In view of the foregoing, we hold that the following amounts, paid by Emersons for the improvements to petitioner's residence, were taxable constructive dividend income to petitioner: 1972
$ 17,465.76
1973
$ 56,171.87
1974
$ 65,993.65
1975
$  9,311.00
Travel and Entertainment Expenditures
We are convinced that most of the travel and entertainment expenses incurred by petitioner were incurred in the furtherance of Emersons' business. And we believe that some part of the Emersons' checks made out to "cash" by petitioner while he was travelling provided funds he used in the furtherance of that business. We thus find arbitrary and excessive respondent's assertion that the entire amount of these expenditures constituted income in the form of constructive dividends to petitioner. As was the case in Dowell v. United States,522 F.2d 708 (5th Cir. 1975), petitioner travelled and entertained constantly in the promotion of Emersons' business. When petitioner was in charge of Emersons, the chain experienced a headlong growth -- from one restaurant to 40 throughout *277 the eastern United States -- in the space of a few years. The costs of that travel and entertainment furthered Emersons' business, and most of it is not properly considered income to him. As was also the case in Dowell, we have been presented with a "blizzard" of documents, including petitioner's reimbursement vouchers, credit card receipts, and daily calendars. Neither party has undertaken to organize these documents comprehensively, and our attempts to do so have been unavailing. The handwriting on the checks and vouchers in many instances is indecipherable, and often the figures presented do not agree with their totals. The business purposes of the claimed expenses have sometimes been indicated, but other times, they have not. We are not convinced that each of the expenses actually related to Emersons' business as opposed to petitioner's separate economic or personal interests. The most frequent beneficiary of the expenses attributed to petitioner, other than petitioner himself, is one "Bud" Mayo. Ralph Emerson, a co-founder of Emersons, testified that Mayo was a "close friend" of petitioner who served as an investment advisor, and who later, after petitioner was fired, *278 sat on Emersons' board, carrying out petitioner's will. Moreover, a fair amount of travel took petitioner to places to where the record shows no direct business activity, such as Vail, Colorado, or Paris, France. Notwithstanding petitioner's devotion to Emersons, we believe he also used the company's treasury to pay for some personal recreation. Moreover, some of the expenses were for travel costs incurred by petitioner's wife, who accompanied him on personal business trips. These have not been shown to be necessary for the advancement of Emersons' business, and are, instead, properly charged as income to petitioner. United States v. Gotcher,401 F.2d 118 (5th Cir. 1968). In view of the foregoing, we have determined that petitioner received the following amounts of taxable constructive dividend income in the form of the travel and entertainment payments by Emersons. (We have reduced our findings as to 1973 to reflect documentary evidence that petitioner repaid Emersons some $ 1,717.15 in travel advances for that year.) 1972
$  5,312.76
1973
$  6,326.67
1974
$  7,840.82
1975
$ 11,162.37
Beer Kickbacks
Petitioner received substantial *279 cash payments from the Schlitz and Falstaff breweries, and their distributors, in payment for the sale of their products in Emersons' restaurants. We do not accept petitioner's contentions that he received no payments from Schlitz. We accept instead the testimony of Moe Bisker that petitioner received cash in plain envelopes as payment for petitioner's selling Schlitz products in Emersons' restaurants. We also find credible the statement by petitioner's accountant that, at petitioner's request, a sample tax return was prepared showing the receipt of cash by petitioner from Schlitz. Additionally, we find that petitioner benefitted directly from the payments. Petitioner's evidence is insufficient to convince us that all the Schlitz payments went to the Warren Adler Company to pay for advertising for Emersons. That testimony is contradicted by the testimony of Bisker and petitioner's accountant indicating that money went directly to petitioner. Petitioner's further argument that the kickbacks attributed to him went instead into the pockets of others in the breweries' organization is imaginative, but it is not one that we accept. [3]
*280 On this record, and in view of petitioner's secrecy concerning the beer kickbacks, it appears to us that he retained most of the cash kickbacks given to him for his personal benefit. We believe, however, that petitioner did take some of the kickbacks with the intention of spending the cash on behalf of Emersons -- such as for promotional activities, the payment for restaurant-opening celebrations, and so forth. We further believe that he did in fact spend some of the cash kickbacks he received upon the business of Emersons. With respect to the beer kickbacks, as with respect to most other aspects of Emersons' business, petitioner consistently refused to distinguish between money spent for his personal benefit, and that spent for the furtherance of Emersons' business. On the record before us, and using our best judgment, we have determined that the following amounts of beer kickbacks were received by petitioner and used for his personal benefit, and were thus taxable income to him. 1972
$  9,189.60
1973
$ 13,774.20
1974
$  5,999.00
Petty Cash Withdrawals
Petitioner used the petty cash functions of the Emersons' restaurants in the environs of the *281 corporate headquarters as his personal bank accounts. When he needed money, he stopped into an Emersons' restaurant and got it. Unlike the situation when petitioner was travelling for the company, his acquisitions of petty cash from restaurants near his home likely went to pay personal expenses, such as meals and other miscellaneous purchases. Petitioner's lack of candor as to his other financial dealings has caused us to disregard many of the written justifications appearing on the petty cash vouchers he signed. Most of the amounts, in our judgment, thus were properly taxable income to petitioner. He is chargeable with petty cash withdrawals as constructive dividends as follows: 1972
$ 3,232.68
1973
1,484.00
1974
960.00
1975
2,820.00
Miscellaneous Expenditures
Respondent attributed many unexplained expenditures of Emersons as income to the petitioner. In view of petitioner's readiness to appropriate Emersons' funds for his personal uses, we cannot fault respondent's reasoning in this regard. Most of the expenditures were those made by, or for, petitioner, and it is not unreasonable to require that he explain that they were not income to him. Again, *282 we do not in each instance find convincing the handwritten justifications given with the checks or other documents which indicate that given miscellaneous payments have been made. [4] We have, however, found that petitioner's explanations suffice to demonstrate that some of the expenses charged as income to him, were not, in fact, income to him. Most of his explanations relate to his travelling and entertainment expenses, and we have given him the benefit of a doubt in that regard. With respect to the miscellaneous expenses, petitioner has convinced us that some are not properly income to him, as described below. *283 For 1972, we believe that the Caliban Realty payments were for employee incentives, namely weekends at the beach awarded for selling the most "Grog," an Emersons' specialty. The payments to the Yeshiva Farm and Bobower Yeshiva were deductible charitable contributions, not income to petitioner. Knott v. Commissioner,67 T.C. 681 (1974). The payment to Garnett Haas was for modeling; the advertisements, flyers, and house publications of Emersons featured many photographs of models. We note that the check to Ms. Haas was endorsed by her studio. For 1973, the payment to Garnett Haas was again for modeling; and the payments to Caliban Realty were again for employee incentives. A check to Elizabeth Ray, and another to Congressman Gray, endorsed by him and by Ms. Ray, his employee, were for publicity for the Dimples' discoteques. Payments to Bachrach, a photographer, were for Emersons' business to the extent of $ 279.51. The balance of payments to Bachrach appear to have been extra prints of photographs of petitioner, and, on this record, are properly chargeable to him. The payment to James Orem was for stocking the bar at Emersons' corporate headquarters, and not *284 income to petitioner. The payment of $ 700 to Miller and Gartner was for accounting services to Emersons, not petitioner; we agree with petitioner that the firm was unlikely to accept a payment on an Emersons' account for services personal to the taxpayer. The payment to Friedlander, Friedlander and Brooks was made for the investigation of zoning problems of Emersons. The payment to Irene Williams was for services in assisting petitioner in preparing the company's annual report. For 1974, the payment of $ 165 to Bolden Tile was explicitly for work done at a cashier's station in an Emersons' restaurant. The year's total payment of $ 98 to the D.C. Bar was for petitioner's membership, but the payment also benefitted Emersons; petitioner utilized his legal training on behalf of Emersons and practiced law for no one else. The payment of $ 350 for tickets to see the Redskins professional football team were for other employees' use, and not petitioner's. For 1974, petitioner has not convinced us that the other payments, those not mentioned above, were for legitimate business purposes of Emersons' rather than for his own benefit. We note especially that we cannot accept petitioner's *285 explanation that Emersons' payment of $ 5,000 to an attorney named Edward Aaronson benefitted Emersons by arranging for the rental of more office space. To the contrary, on the record, the payment is to settle a civil suit involving petitioner's personal residence, and the $ 5,000 is chargeable as income to him. In 1975, the payments to Ann Barry and Hyla Marrow were, according to Emersons' records, for modeling fees for company publications. For none of the years at issue has petitioner presented us with a basis for rejecting respondent's amounts of constructive dividends relating to petitioner's, and his wife's, use of company-provided automobiles. See Commissioner v. Riss,374 F.2d 161 (8th Cir. 1967), affg. on this issue a Memorandum Opinion of this Court. Nor -- other than the instances set forth above -- has petitioner demonstrated that respondent's attribution of miscellaneous expenses as income to him is arbitrary or excessive. In view of the foregoing, we have determined that the "miscellaneous expenses" of Emersons are taxable income to petitioner as follows: 1972
$  6,719.06
1973
7,381.17
1974
18,447.71
1975
17,426.37
*286 We see no basis for reducing the amounts of constructive dividends by amounts petitioner now insists were owing to him by Emersons, such as payments for his surrender of stock options, or vacation pay, or reimbursement for losses on petitioner's ill-advised purchase of Longchamps' stock, allegedly for Emersons' account. The reimbursement mechanism of Emersons, as shown to us in hundreds of vouchers submitted by petitioner, worked too well for us to believe that any claim petitioner had against Emersons survived to offset the constructive dividends we now find have been made. (We must also assume that any claims petitioner had against Emersons would have been presented for adjudication to the Bankruptcy Court). [5] None of the alleged amounts now claimed as an offset has taken the form of enforceable debt against Emersons; and even if it had, there is no showing that the amounts characterized as constructive dividends were meant to pay off such debts. On this record we have no basis for believing that any expenditures by petitioner on behalf of Emersons were other than the type that gives rise to no deduction to the investing shareholder. Such investments, if they have any tax effect, *287 obtain it by being capitalized and added to the basis of the shareholder's stock. Eskimo Pie Corp. v. Commissioner,4 T.C. 669 (1945), affd. 153 F.2d 301 (3d Cir. 1946); South American Gold & Platinum Co. v. Commissioner,8 T.C. 1297 (1947), affd. 168 F.2d 71 (2d Cir. 1948); Ihrig v. Commissioner,26 T.C. 73 (1956); Rittenberg v. United States,267 F.2d 605 (5th Cir. 1959). The gain or loss on petitioner's stock in Emersons, however, is not an issue that is presently before us. Fraud
Respondent has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). To meet this burden respondent must show petitioner intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection *288 of taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983). Respondent must prove fraud for each year he determines the addition to tax under section 6653(b). Shaw v. Commissioner,27 T.C. 561 (1956), affd. 252 F.2d 681 (6th Cir. 1958). We consider the entire record to determine whether fraud exists. Estate of Pittard v. Commissioner,69 T.C. 391, 400 (1977); Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978); Stratton v. Commissioner,54 T.C. 255, 284 (1970). Respondent may, however, prove fraud through circumstantial evidence since direct evidence of the taxpayer's intent is rarely available. Spies v. United States,317 U.S. 492 (1943); Rowlee v. Commissioner, supra at 1123. Respondent cannot rely on petitioner's failure to prove error in respondent's determination of the underlying deficiency to meet his burden of proving fraud. Habersham-Bey v. Commissioner,78 T.C. 304, 312 (1982); *289 Otsuki v. Commissioner,53 T.C. 96, 106 (1969); Pigman v. Commissioner,31 T.C. 356, 370 (1958). We may infer fraud from a pattern of conduct. Spies v. United States, supra at 499. An inference of fraud is justified by a demonstration of consistent underreporting of income, especially if other circumstances showing an intent to conceal income are present. See Holland v. United States,348 U.S. 121, 137 (1954); Otsuki v. Commissioner, supra.We may infer fraud where the taxpayer prepares false documents, Stephenson v. Commissioner,79 T.C. 995 (1982), affd. 748 F.2d 331 (6th Cir. 1984). Furthermore, fraudulent intent may be more easily inferred where the taxpayer is intelligent, educated, and knowledgeable about taxes. Simms v. Commissioner,422 F.2d 340 (4th Cir. 1970), affg. a Memorandum Opinion of this Court; O'Connor v. Commissioner,412 F.2d 304, 310 (2d Cir. 1969), affg. on this issue a Memorandum Opinion of this Court, cert. denied 397 U.S. 921 (1970). [6]
*290 In this case, respondent has met his burden of proving fraud against petitioner. Here, as specified above, in each of the years at issue, petitioner received large amounts of income which he did not report on his income tax returns. He was given thousands of dollars in kickbacks from beer companies who were willing to pay the price of having petitioner stock their wares in Emersons' restaurants. He remodeled and furnished his home lavishly, at Emersons' expense, and then directed that invoices which would reflect these improvements to his home be disguised to indicate that the expenditures were made for Emersons' facilities. The Emersons' accounts were even used to pay the wages and withholding taxes for petitioner's household maid. Moreover, he used Emersons as a personal bank account, obtaining spending money merely by stopping at an available restaurant and signing a corporate voucher. He used the travel and entertainment accounts of the restaurant chain to underwrite personal vacations, and incidental wining and dining along the way. He was a sophisticated lawyer and businessman who could boast of a graduate law degree, association with one of the leading law firms in Washington, *291 D.C., and a stint at the U.S. Department of Justice. His record in building the Emersons' chain shows that he was a savvy entrepreneur, who maintained a luxurious lifestyle. He lived far above the means that his salary from Emersons -- as reported on his income tax returns -- would indicate. It defies logic to argue now that this petitioner was unaware that he should report the means of maintaining that lifestyle on his personal income tax returns. We can think of few examples where the circumstantial evidence shows more clearly that a taxpayer intended to evade taxes known to be owing by his patterns of concealing the income he received. The additions to tax imposed by section 6653(b) for fraud are properly imposed upon the deficiencies determined in petitioner's Federal income taxes for each of the years at issue. [7]
Our finding that the understatements *292 for all the years in issue were, at least in part, due to fraud also requires that we hold that the statute of limitations does not bar the assessment and collection of taxes and additions from petitioner for his taxable year 1972. See section 6501(a). Transferee Liability
Section 6901(a) provides that respondent may enforce the liabilities "at law or in equity, of a transferee * * *" of a taxpayer "in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred." This section does not impose any new obligations upon the transferee of property of a taxpayer; it merely permits collection from that taxpayer by a summary procedure of its existing liability in law or equity. See Commissioner v. Stern,357 U.S. 39, 42-43 (1958); Phillips v. Commissioner,283 U.S. 589, 592 (1931); Coca-Cola Bottling Co. of Tucson v. Commissioner,334 F.2d 875, 877 (9th Cir. 1964), affg. 37 T.C. 1006 (1962). The existence of the liability of the transferee must be determined by the applicable state law, in this case the law of Maryland, where the *293 transfers at issue took place. See Commissioner v. Stern, supra at 45; Rowen v. Commissioner,215 F.2d 641, 647 (2d Cir. 1954), revg. a Memorandum Opinion of this Court. Section 6902 imposes upon respondent the burden of proving such transferee liability. In general, an essential element to the imposition of transferee liability is the insolvency of the transferor as a result of the transfer. Kreps v. Commissioner,351 F.2d 1 (2d Cir. 1965), affg. 42 T.C. 660 (1964); Mysse v. Commissioner,57 T.C. 680 (1972). Here, respondent concedes that Emersons was not insolvent at the time of the transfers to petitioner. Respondent, however, relies upon a provision of Maryland law, Md. Com. Law Code Ann. sec. 15-207 (1983), under which proof of the insolvency of the transferor is not necessary to impose liability upon the transferee for the transferor's obligations. Lacey v. Van Royen,259 Md. 80, 267 A.2d 91 (1970). See Md. Com. Law Code Ann. secs. 15-209, 15-210 (1983). Section 15-207, under which respondent seeks to proceed, provides *294 as follows: Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud present or future creditors, is fraudulent as to both present and future creditors. It is settled that the party seeking to impose transferee liability under the above section must prove that the parties to the transfer have "'actually intended' to hinder, delay, and defraud present and future creditors." Eastern Md. Dist. Meeting of Church of Brethren v. Union Bridge Banking & Tr. Co.,184 Md. 241, 40 A.2d 518, 521 (1945). In construing language like that presented in sec. 15-207, this Court has found "actual intent, as distinguished from intent presumed in law," when the actions of the transferor's sole shareholder showed "a studied attempt to hinder, delay, and defraud the Commissioner in the collection of taxes." Wiener v. Commissioner,12 T.C. 701, 708 (1949). In addition to a demonstration of "actual intent" to defraud, the party attacking a conveyance under sec. 15-207 must show that both the grantor and grantee participated in the fraudulent intent. Berger v. Hi-Gear Tire and Auto Supply,257 Md. 470, 263 A.2d 507 (1970). *295 Here respondent has fallen short of proving, as he must, an "actual intent" by petitioner and Emersons to hinder, delay, and defraud respondent [8] in the collection of taxes. Petitioner's activities, while apparently designed to escape his own tax liabilities, are inconsistent with any intentional attempt to prevent the collection of Emersons' taxes. Thus, to be sure, petitioner doctored Emersons' inventories, but the effect of his activities was to raise Emerson's putative income, and, hence, its exposure to higher taxes. And while petitioner took many "disguised" dividends from Emersons, there is no basis for us to conclude that he did so to prevent the collection of Emersons' taxes. The situation here is vastly different from that of the usual fraudulent transfer situation we have addressed -- in those cases, the controlling shareholder transfers the assets of the corporation to himself or others, so that he, and not the Internal Revenue Service, can have the use and benefit of the assets transferred. See Bartmer Automatic Self Service Laundry, Inc. v. Commissioner,35 T.C. 317 (1960); Wiener v. Commissioner,12 T.C. 701 (1949). Here, however, *296 Emersons was such a big operation that such duplicity was unnecessary. Petitioner got all he needed without plotting to deprive respondent of Emersons' tax revenues. We note that petitioner's too-facile use of Emersons' assets for his own benefit took place not only in years when Emersons had taxable income but also in years when Emersons was incurring losses. His actions thus indicate that his activities were not motivated by considerations of Emersons' tax liability. [9] Additionally, we are inclined to believe that if petitioner had taken a salary in the amounts of the "disguised" dividends he took from the corporation, the amount of that salary would have been a deductible expense to Emersons. Those amounts would not have been subject to corporate tax, further indicating that taxpayer's taking constructive dividends was not motivated by a desire to avoid taxation of Emersons' income. *297 Moreover, there is no evidence showing that Emersons, as transferor, agreed with any program to defraud respondent in his collection of its taxes. Indeed, when Emersons' board of directors became aware of petitioner's shady dealings, it forced his resignation and sued for restitution of the amounts he had taken. Under these circumstances, we cannot find that any intention of petitioner to defraud respondent from collection of Emersons' taxes, even if such an intent had been proved, could also be attributed to Emersons. See Botwinik Brothers of Mass., Inc. v. Commissioner,39 T.C. 988, 996-997 (1963). Our failure to find an " actual intent" to defraud the respondent in collecting Emerson's taxes is reinforced by several other factors. Most of the "transfers" from Emersons to petitioner took place when Emersons was solvent, and when there was no pending litigation that would threaten Emersons' solvency. The transfers at issue also represent no departure from the usual course of business; instead, petitioner's cavalier use of Emersons' assets for his personal benefit seems to characterize his method of operating throughout his career with Emersons. Nor do the *298 transfers here in issue represent a transfer of Emersons' entire estate; rather, they are insignificant when compared with the scope of Emersons' business. Finally, Emersons did not retain rights or possession of the property transferred; indeed, the benefits petitioner received from Emersons are taxable to him precisely because these benefits did not redound to the benefit of Emersons, but rather to the personal benefit of petitioner to the detriment of Emersons and its other shareholders. Berger v. Hi-Gear Tire and Auto Supply, supra at 510, quoting 37 Am.Jur.2d, Fraudulent Conveyances, sec. 10 (1968). Here, most of the deficiencies in Emersons' taxes arise from respondent's disallowance of pre-opening restaurant expenses as deductions, rather than capital expenditures. There is no basis for visiting the results of this disallowance upon petitioner. Petitioner's avarice and bad recordkeeping practices have subjected him to substantial additions relating to his own tax liabilities, but under the law and the facts as presented to us, he is not liable for the taxes of Emersons as well. We accordingly hold that there *299 was no fraudulent intent by petitioner as transferee to deprive respondent of taxes due from Emersons. We further hold that, even if such an intent by petitioner had been proved, Emersons did not share in that intent. Accordingly, we find that respondent has failed to prove that transferee liability exists. [10]
*300 In view of the foregoing, Decision will be entered for petitioner in dkt. No. 31633-81 and decision will be entered under Rule 155 in dkt. No. 30518-84.
Footnotes
1. Unless otherwise indicated all section references are to the Internal Revenue Code of 1954 as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. See also section 61(a): "gross income means all income from whatever source derived, including * * * (7) dividends; * * *."↩
3. The evidence in support of the notion that the beer kickbacks were distributions from Emersons is somewhat attenuated. But in view of our disposition of the case, it is not necessary to determine whether they were corporate distributions. They were amounts provided to petitioner in exchange for his conferring benefits upon the payers. They were not gifts. They are income to him. Cf. Commissioner v. Duberstein,363 U.S. 278↩ (1960).
4. The situation is not that presented in cases such as Weimerskirch v. Commissioner,596 F.2d 358 (9th Cir. 1979), revg. 67 T.C. 672↩ (1977), where respondent has asserted unreported illegal taxable income chargeable to the taxpayer, and then relied upon the presumption of correctness to sustain the resulting deficiencies. In such cases, the Courts have required respondent to demonstrate a connection between the taxpayer and the income charged to him. Here, the connection between petitioner and the income charged to him -- expenditures of Emersons -- is obvious, and in most instances fairly specific. Nevertheless, mindful of the difficulty petitioner faces in proving a negative, we have declined to charge him with income when, in our view, no connection between petitioner and the item of income is apparent from the record. In such instances, his explanations are sufficient to prevent him from being charged with the item of income at issue.
5. Indeed, petitioner was forced to reimburse Emersons for the home improvements provided for him. Such reimbursements, however, came after the years at issue, and thus cannot affect our determination of the value, and taxability, of the home improvements received by petitioner under a claim of right during the years before us.↩
6. See Panzitta v. Commissioner,T.C. Memo. 1986-279↩ (a graduate of college and law school found liable for fraud).
7. Petitioner attached a statement to his 1975 Federal income tax return indicating that the SEC case against him might cause him to reimburse Emersons for some expenses. This equivocal statement does not, in our view, remove our conviction that petitioner intended to understate his income fraudulently for that year.↩
8. Citing Spuck v. Logan,97 Md. 152, 54 A. 989 (1903), respondent urges that the "intent to defraud" need not be directed against any particular creditor. Suffice it to say, for the reasons set forth, infra, we have not been shown any actual intent by petitioner to defraud any↩ creditors of Emersons. 9. The fact that petitioner acted consistently regardless of whether Emersons was in a profit or loss mode convinces us that respondent has failed to prove an alternate theory -- that the use of Emersons' assets was "a series of transfers in pursuance of a plan which ultimately would leave the transferor insolvent." Under this theory, transferee liability could be imposed upon petitioner even without a showing of fraudulent intent to prevent the collection of Emersons' taxes. Not only has respondent failed to convince us to accept this "series of transfers" theory, but also he advocates it only "with regard to the taxable year ended October 31, 1976," which is not a year before the Court.↩
10. Because of our disposition of the transferee issue, we need not, and do not, address other issues raised, such as whether respondent's failure to enter a proof of claim for the amounts at issue in Emersons' bankruptcy proceeding until May of 1979, or respondent's granting a $ 500,000 refund based upon claimed net operating losses, have any impact upon respondent's showing that he made all reasonable attempts to collect the taxes from Emersons before attempting to recover them from petitioner. We also do not address the issue whether respondent's proceeding against a transferee violates the automatic stay provisions of the bankruptcy code. See Dixon v. Bennett,72 Md. App. 620, 531 A.2d 1318 (1987), cert. denied 311 Md. 557, 536 A.2d 664 (1988); Kathy B. Enterprises, Inc. v. United States,779 F.2d 1413↩ (9th Cir. 1986).